**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| **RICHARD CASHON, individually and on behalf of all other similarly situated,** | **Case No.:** 2:24-cv-03856-RMG |
| **Plaintiffs,** | <u>**CLASS ACTION**</u> |
| **v.** | <u>**DEMAND FOR JURY TRIAL**</u> |
| **GENERAL MOTOS LLC; ONSTAR LLC; LEXISNEXIS RISK SOLUTIONS, INC.; VERISK ANALYTICS INC.,** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Richard Cashon ( "Plaintiff"), by and through the undersigned counsel, brings this action against Defendants General Motors LLC ("GM"), OnStar LLC ("OnStar"), LexisNexis Risk Solutions Inc. ("LexisNexis") and Verisk Analytics Inc., ("Verisk" and collectively with GM, OnStar and LexisNexis, "Defendants"), individually and on behalf of all others similarly situated ("Class Members"), and in support thereof, allege upon personal knowledge as to their own actions, and upon information and belief and their counsels' investigations as to all other matters, as follows:

## INTRODUCTION

1.      This case arises from the clandestine tracking, interception, transmission, and collection of Americans' driving behavior data with secret computer systems automatically installed in their vehicles or on their cellular telephones.

2.      In recent years, vehicles have become more and more sophisticated, integrating electronics into nearly every component. These electronics perform a variety of functions, including running a vehicle's engines, brakes, air conditioning, and entertainment systems.

3.      But as was recently unveiled in a March 11, 2024 New York Times article,[1] these electronics were also carrying out a more nefarious purpose: the secret tracking, interception, transmission, and collection of millions of drivers' personal driving behavior data, which was then sold by GM and OnStar through intermediaries such as LexisNexis Risk Solutions to automobile insurance companies, who in turn used the data to increase drivers' vehicle insurance premiums.

4.      Just eleven days later, GM announced that it had ceased its practice of sharing its customers driving data with LexisNexis Risk Solutions and Verisk – a practice that had included more than 8 million vehicles.

5.      The information collected included what LexisNexis and Verisk call "telematics data," which itself includes acceleration events, hard brake events, high speed events, distance traveled, time of day traveled, vehicle information such as VINs, and sometimes location data and GPS data.

6.      Plaintiff Cashon is just one of the millions of drivers of GM-manufactured vehicles who have had their data secretly intercepted and used in this illegal scheme. He brings this action for damages and injunctive relief on behalf of all persons whose driver behavior data was impacted by Defendants' illegal conduct.

## PARTIES

### A.      Plaintiff

7.      Plaintiff Richard Cashon is a natural person, and a resident and citizen of South Carolina. Plaintiff Cashon resides in Mount Pleasant, South Carolina.

---

[1] Kashmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, N.Y. TIMES (Mar. 11, 2024), https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html

**B.**     **Defendants**

8.     Defendant General Motors LLC is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located in Detroit, Michigan. GM manufactures and sells vehicles in the United States and across the world, including Chevrolet, GMC, Cadillac, and Buick branded vehicles.  GM is registered with the South Carolina Secretary of State doing business in South Carolina.

9.     Defendant OnStar LLC is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located in Detroit, Michigan. Defendant OnStar is a subsidiary of Defendant GM and provides communications, security, emergency services, navigation, diagnostics, and information services to GM vehicles in the United States and across the world. OnStar is registered with the South Carolina Secretary of State doing business in South Carolina.

10.     Defendant LexisNexis Risk Solutions Inc. is a corporation organized under the laws of Delaware with its principal place of business in Alpharetta, Georgia. Defendant LexisNexis obtained Plaintiff' and Class Members' driver behavior data from GM and OnStar and shared it with third parties, including insurance companies. LexisNexis Risk Solutions is registered with the South Carolina Secretary of State doing business in South Carolina.

11.     Defendant Verisk is a Delaware corporation with its principal place of business in New Jersey. At all times relevant to this Complaint, Verisk obtained drivers' behavior data in South Carolina and made it available to third parties including automobile insurance companies.

<u>**JURISDICTION AND VENUE**</u>

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this action alleges violations of federal law. This Court has supplemental jurisdiction over the state-law claims in this action pursuant to 28 U.S.C. §1367.

13.    This court also has original subject matter jurisdiction under the Class Action Fairness Act, 2 U.S.C. section 1332(d), because at least one member of the proposed class is a citizen of a state different from that of defendants; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and the proposed class comprises more than 100 class members.

14.    This Court has personal jurisdiction over each Defendant and venue is proper pursuant to 28 U.S.C. §1391, because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District.  Plaintiff resides in this District and purchased the vehicle in question in this District.  Defendant GM has marketed, advertised, sold, and leased vehicles within this District.  Plaintiff is informed and believes that Defendants OnStar and LexisNexis marketed, advertised, and sold their services within this District.

## FACTUAL ALLEGATIONS

### A.    The Scheme

15.    Starting in 2015, GM equipped many of its vehicles with OnStar software and related applications.

16.    In 2016, OnStar introduced a feature called the "OnStar Smart Driver" to monitor and score driver behavior, capturing many metrics about a vehicle's condition and performance.

17.    The OnStar-related applications on GM vehicles, with names such as MyGMC, MyChevrolet, MyBuick, and MyCadillac, allow GM and OnStar to collect, record, store, and transmit data relating to driver behavior, among other things such as the vehicle's condition. Driver behavior includes things such as the driver's average speed; percentage of time the driver exceeds

80 miles per hour; the driver's frequency and intensity of acceleration and braking; and late-night driving. The OnStar software collects, records, and stores this myriad driver behavior data after each drive.

18.     Importantly, while GM claims it does not automatically enroll drivers in OnStar, that OnStar is an "opt-in" application, and that OnStar does not collect driving behavior data without consent, research has shown that this is a lie. Instead, GM and OnStar track, collect, intercept, store, and ultimately transmit and share driver behavior data with third parties, whether or not a driver consents.

19.     The New York Times reported that GM – in order to receive driver data from its vehicles – completes monthly report card for its dealerships which incentivize GM dealership employees to enroll car buyers in OnStar, with one employee stating his pay was docked if he failed to sign up the car buyer.

20.     The New York Times also suggested that the dealership enrollment process does not provide car buyers with an opportunity to review and understand the terms of the enrollment, and that dealership employees are not trained to understand the terms of the services.

21.     Even if the buyer does not enroll at the dealership, the driving data is still being harvested for the benefit of GM, OnStar, LexisNexis, Verisk and automotive insurance providers.

22.     It is clear that neither GM nor OnStar provide consumers with any disclosure that their driver behavior data is being or will be collected, gathered, stored, transmitted, or sold to third parties, much less without compensating the consumer for their data. More disconcerting still is that GM and OnStar do not disclose their sale of driver behavior data to third parties like LexisNexis and Verisk who then resell – for profit – the data to automobile insurers resulting in higher insurance quotes or premiums.

23.     Instead, GM and OnStar make false and misleading representations to consumers that OnStar is an "optional" product, that collection of their data is "optional," and that OnStar simply "help[s] [drivers] maximize their vehicle's overall performance, reduce vehicle wear and tear and encourage safe driving."

24.     Defendants claim to have secured drivers' consent for the collection and dissemination of driving data. Yet, this purported 'consent' is obscurely placed in the fine print of lengthy and ambiguous privacy policies, effectively concealing the existence of these partnerships and the full scope of data sharing from the drivers.

25.     Even for drivers who consciously opt into services like OnStar's Smart Driver, the disclosures fall short of transparently acknowledging the extent of data sharing. For instance, there was no clear warning or prominent disclosure indicating that opting into such services would result in third-party access to one's driving data. This practice is misleading and obscures the true risks associated with data sharing.

26.     GM's and OnStar's interception, misrepresentation, and material omission contradicts the very promise these Defendants make to use appropriate safeguards to protect drivers' data from unintended disclosure.

27.     To be sure, GM and OnStar were recently forced to admit that they had, in fact, been sharing drivers' data with third parties such as LexisNexis and Verisk all along, stating, "As of March 20, 2024, OnStar Smart Driver customer data is ***no longer*** being shared with LexisNexis or Verisk." (emphasis added). By this time, likely tens or hundreds of millions of driver behavior data points had been surreptitiously collected, transmitted, and sold by GM and OnStar to third parties like LexisNexis, which in turn sold those data points to insurance companies, collectively costing consumers millions of dollars in higher insurance premiums.

28.    LexisNexis and Verisk were not some good-faith, innocent data broker, but an integral player in the scheme.

29.    LexisNexis is a self-described "analytics provider for industries around the globe, including financial services, retail/ecommerce, logistics and telecommunications," LexisNexis offers data analytics to thousands of other companies, including the automobile insurance industry, claiming to "help insurers and automakers streamline business processes, control costs and improve customer experiences."

30.    Indeed, LexisNexis purports to "help" automobile insurers by collecting and consolidating third-party data that can be used to set or modify (most often, increase) drivers' automobile insurance quotes or premiums.

31.    Among the data LexisNexis offers to insurers, for a price, is driver behavior data. As LexisNexis itself touts, it combines "[e]verything [insurers] need to assess driving risk, all in one place."

32.    LexisNexis boasts that its data analytics provides "comprehensive insights about household drivers, vehicles, and policy history," and outs its "telematics solutions" as "provid[ing] timely connected car data and mobility risk insights[.]"

33.    More specifically, LexisNexis admits to "receive[ing] and manage[ing] data from connected vehicles, mobile apps and third-party services. The driving behavior data received is normalized and used to generate scores and attributes that are more easily ingested into insurance workflows to help better assess risk." According to LexisNexis, this allows insurers to "predict insurance loss potential," *i.e.*, set quotes or premiums. LexisNexis is unabashed about what it offers to automobile insurers, promising to: "improve your ability to assess risk and capture otherwise missed premium."

34.    The transmission of the driving data from LexisNexis to automotive insurance providers, which it states is supposed to "better assess risk" of the driver, lacks context for the reported driving behavior (i.e., driving conditions).

35.    As such, this data does nothing to assess risk, but rather, is a conduit for LexisNexis to make money off of unsuspecting drivers.

36.    Verisk provides analytics data to help insurers improve their profitability and growth. Verisk's website[2] explains that, "Insurers need innovative solutions to meet customer needs and drive growth in the face of evolving risks, regulations, and macroeconomic challenges. As a strategic partner to the global insurance industry, our advanced data analytics, software, scientific research, and deep industry knowledge can help you along the path to profitable growth—now and in the future."

37.    On its website[3], Verisk explains that it compiles and stores driver behavior data for use by auto insurers. It states, "Also included in Verisk's suite of solutions is the Verisk Data Exchange™, which is one of the largest telematics data exchanges of its kind and contains more than 290 billion miles of driving data from consenting drivers of connected cars. The Verisk Data Exchange empowers auto insurers to access the driving behavior insights they need to provide telematics pricing and discounts instantly during the quoting process through the leading DrivingDNA® product family. With advanced analytics and data refinement capabilities, insurers who use Verisk's solutions can gain turnkey access to automotive telemetry that supports the development and growth of usage-based insurance. Numerous auto insurers have already connected to the Verisk Data Exchange, including four of the 10 largest U.S. carriers."

---

[2] https://www.verisk.com/insurance/ (last accessed May 16, 2024).
[3] https://www.verisk.com/company/newsroom/verisk-acquires-data-driven-safety-to-further-expand-autoinsurance-analytics/ (last accessed May 16, 2024).

38.     Verisk also posted an article on its website[4] on November 10, 2023 explaining how auto insurers can "get back to profitability." One of its suggestions is for auto insurers to "[l]everage connected-car telematics to elevate UBI [usage- based insurance] programs for a frictionless customer experience with a single API call, and use an insurance-ready driving score on actual driving behavior."

39.     LexisNexis and Verisk do not disclose that the driver data they sell to automobile insurers is procured from GM and OnStar without consumer drivers' knowledge or consent.

40.     In simple terms, LexisNexis and Verisk obtain drivers behavior data, repackage it, and sell it to automobile insurers, which often results in higher insurance premiums for the drivers whose data is being used. This occurs without drivers' full knowledge and consent, including Plaintiff and Class Members.

41.     Plaintiff and Class Members did not choose to have their driving patterns compiled by LexisNexis and Verisk to be distributed to their car insurance providers against their interest. By GM's own terms, it cannot share data with LexisNexis and Verisk and car insurance providers from which Plaintiff and Class Members never chose to receive services.

42.     Similarly, Plaintiff and Class Members never authorized LexisNexis Risk Solutions, Verisk or their auto insurance providers to request their driving data from GM.

43.     Yet, automotive insurance providers are using the LexisNexis and Verisk reports to set or modify auto insurance quotes or premiums.

44.     Plaintiff and Class Members did not know that insurance companies were receiving their driving data from LexisNexis and Verisk. They would not have knowingly consented to

---

[4] https://www.verisk.com/blog/personal-auto-is-off-roading-how-to-get-back-to- profitability/ (last accessed May 16, 2024).

LexisNexis and Verisk's sharing of their driving data with insurance companies, much less the use of the driving data to determine their driving abilities and insurance rates.

45.     On information and belief, LexisNexis nor Verisk have ever disclosed that they obtain driver behavior data from GM or OnStar without drivers' knowledge or consent, nor that it sells such data to automobile insurers. Obviously, neither LexisNexis or Verisk has ever compensated any of those drivers even a penny of its profits from their sales.

46.     Rather, LexisNexis and Verisk knowingly purchase or otherwise obtain the driver behavior data that GM or OnStar surreptitiously intercepts and collects. Then, LexisNexis and Verisk turn a profit for themselves by marketing that driver behavior data to automobile insurers, who in turn often set or increase drivers' quotes or premiums based on the data. Everyone in this series of transactions profits, except drivers themselves – the very people whose data is being collected and brokered without their full knowledge and consent.

47.     Plaintiff and other Class Members suffered actual harm and the risk of future harm as a result of GM and OnStar's illicit activities, including, but not limited to, invasion of their privacy interest in their own data, loss of control over their own data, the sale of their own data without compensation, and adverse credit reporting and impaired credit scores.

**B.     Plaintiff's Experiences**

48.     Plaintiff Cashon owns a vehicle manufactured by GM: a 2018 Sierra Crew Cab. Plaintiff Cashon purchased the vehicle in January 2022.

49.     Plaintiff Cashon's insurance payment increased every 6 months from January 2023 to July 2024: by $76.35 from January 2023 to July 2023; by $97.07 from July 2023 to January 2024; and by $99.62 from January 2024 to July 2024.

50.     In just a year and a half, his insurance payment increased by over $273 without any adverse events.

51.     The Verisk Report displays metrics such as "hard braking events" and "rapid acceleration events" without context or explanation.

52.     The LexisNexis Report was requested by Plaintiff but has not been obtained due to difficulties LexisNexis places on Plaintiffs in obtaining their full Report in a timely manner.

53.     The reports do not explain how or why someone might have experienced these events. Stating these events, by themselves, says nothing of the other driving conditions and factors one may have experienced.

54.     Plaintiff Cashon has never knowingly opted into sharing his driving behavior data with anyone, much less agree that his driving behavior data could be shared with or sold to a third party who would thereafter share or sell his information to other companies.

55.     Plaintiff Cashon is informed and believes that GM and/or OnStar sold and shared his driving behavior data to LexisNexis and Verisk without his knowledge and consent.

56.     Verisk's consumer-related disclosures and reports regarding driver behavior contain each driving event, including trip details that show the start date, end date, start time, end time, acceleration events, hard brake events, high speed events, distance, and VIN.

57.     Notably absent from these consumer disclosures and reports is any context related to these driving events. The reports do not define what these events mean nor how they are calculated. Furthermore, the reports do not explain how or why someone might have experienced these events. Stating these events, by themselves, says nothing of the other driving conditions and factors one may have experienced.

58.     Upon information and belief, the uncontextualized, misleading, and personal driving information LexisNexis or Verisk shared with Plaintiff Cashon's insurance company resulted in increases in his vehicle insurance premiums.

59.     Moreover, Plaintiff Cashon is informed and believes that GM and OnStar mislead individuals such as his about their data-sharing practices. Plaintiff Cashon never knowingly consented to these practices.

60.     Plaintiff Cashon's privacy has been gravely invaded by Defendants' improper actions.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action on behalf of themselves and on behalf of all other persons similarly situated ("Class Members") under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

62.     Plaintiff proposes the following Nationwide Class definition, subject to amendment as appropriate:

> All persons residing in the United States who owned or leased a GM manufactured vehicle and who had their vehicle's driving data collected and shared with a third party without their consent.

63.     Plaintiff proposed the following South Carolina Class definition, subject to amendment as appropriate:

> All persons residing in South Carolina who owned or leased a GM manufactured vehicle and who had their vehicle's driving data collected and shared with a third party without their consent.

64.    Excluded from the Classes are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, and any entities in which Defendants have a controlling interest; the judges(s) presiding over this matter, and the clerks, judicial staff, and immediate family members of said judges(s); Plaintiff' counsel; and Defendants' counsel.

65.    Plaintiff reserves the right to modify or amend the foregoing Class definitions before the Court determines whether certification is appropriate.

66.    The Classes defined above are readily ascertainable from information in Defendants' possession. Thus, identification of Class Members will be reliable and administratively feasible.

67.    Plaintiff and Class Members satisfy the numerosity, commonality, typicality, and adequacy requirements under Federal Rule of Civil Procedure 23.

68.    *Numerosity*. The Class Members are numerous such that joinder is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Classes each consists of millions of individuals who owned or leased GM vehicles.

69.    *Commonality*. Thise are many questions of law and fact common to the Classes. And these common questions predominate over any individualized questions of individual Class Members. These common questions of law and fact include, but are not limited to:

(a)    Whether GM and OnStar collected and tracked Plaintiff's and the Class Members' driving behavior.

(b)    Whether Plaintiff and the Class Members consented to have their data shared with LexisNexis, Verisk and third parties.

(c)     Whether LexisNexis or Verisk obtained Plaintiff' and Class Members' driver behavior data without consent.

(d)     Whether LexisNexis or Verisk sold Plaintiff's and Class Members' driver behavior data to third parties without consent.

(e)     Whether Defendants conduct constitutes violations of the Fair Credit Reporting Act.

(f)     Whether Defendants' conduct constitutes violations of the Federal Wiretap Act.

(g)     Whether Defendants' practices are considered unfair or deceptive.

(h)     Whether Defendants' practices constitute and invasion of privacy.

(i)     Whether Defendants' conduct was knowing and willful.

(j)     Whether Defendants are liable for damages, and the amount of such damages.

(k)     Whether Defendants should be enjoined from such conduct in the future.

70.     *Typicality*. Plaintiff' claims are typical of those of other Class Members because Plaintiff' information, like that of every other Class Member, was improperly collected and shared with third parties without their consent. Moreover, all Plaintiff and Class Members were subjected to Defendants' uniformly illegal and impermissible conduct.

71.     *Adequacy of Representation*. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Classes. Plaintiff' counsel are competent and experienced in litigating complex class actions. Plaintiff has no interests that conflict with, or is antagonistic to, those of the Classes.

72.    *Predominance*. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff' and Class Members' data was collected, transmitted, and sold in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

73.    *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class Member.

74.    The claims brought herein are manageable. Defendants' uniform conduct, the consistent provision of the relevant laws, and ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this case as a class action.

75.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

76.    Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

77.     Likewise, particular issues under Federal Rule of Civil Procedure 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above.

## CAUSES OF ACTION

### COUNT I

### Violation of Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681e(b)

### (On Behalf of Plaintiff and Class Members Against LexisNexis and Verisk Only)

78.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

79.     Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. §1681e(b).

80.     LexisNexis and Verisk obtain driver behavior data from GM and OnStar and furnishes it to third parties, including automobile insurers, without Plaintiff' and other class Members' full knowledge and consent.

81.     LexisNexis and Verisk's provision of credit information that includes driver behavior data to third parties, including automobile insurance companies, constitutes the furnishing of consumer reports under the FCRA and an impermissible purpose and use of data under the FCRA.

82.     LexisNexis and Verisk, acting as consumer reporting agencies, as defined by 15 U.S.C. §1681c(1), have failed to implement procedures to maintain maximum possible accuracy regarding Plaintiff' and the class Members' driving data.

83.     LexisNexis and Verisk have knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiff and class Members' driving abilities.

84.     As a result of LexisNexis and Verisk's conduct, insurance carriers and others who view these consumer reports receive and in turn rely on an inaccurate representation of Plaintiff' and class Members' driving abilities.

85.     The foregoing deceptive acts and practices constitute reckless and/or negligent violations of the FCRA, including, but not limited to, 15 U.S.C. §1681e(b).

86.     As a result of each and every willful violation of the FCRA, Plaintiff are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. §1681n(a)(1); statutory damages pursuant to 15 U.S.C. §1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. §1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §1681n(a)(3) from Defendants.

87.     As a result of each and every negligent noncompliance of the FCRA, Plaintiff and Class Members are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. §1681o(a)(1); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §1681o(a)(2) from Defendants.

## COUNT II

### Violation of the Federal Wiretap Act, 18 U.S.C. §2510, *et seq.*

### (On Behalf of Plaintiff and Class Members Against All Defendants)

88.     Plaintiff incorporates by reference paragraphs 1 through 77 of this Complaint as though fully stated herein.

89.     The Federal Wiretap Act, 18 U.S.C. §2510, *et seq.*, prohibits the interception of any wire, oral, or electronic communications. The statute confers a civil cause of action on "any person

whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. §2520(a).

90.     "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. §2510(12).

91.     "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4).

92.     "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. §2510(8).

93.     "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. §2510(6). Plaintiff and Class Members are persons as identified by Section 2510(6) of the Federal Wiretap Act.

94.     Defendants through their design, programming, and operation of vehicles equipped with telematics and data collection capabilities, have intentionally intercepted, endeavored to intercept, or procured others to intercept or endeavor to intercept, electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. §2511(1)(a).

95.     This interception of electronic communications was acquired during transmission, involving real-time data exchange between the vehicles and Defendants' servers, to acquire the content of Plaintiff' and Class Members' electronic communications.

96.     The contents intercepted include, but are not limited to: location data, driving behavior data, and potentially other sensitive information transmitted from the vehicles.

97.     As a direct result of Defendants' actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to the unauthorized interception and transmission of private and personal, confidential, and sensitive communications and data.

98.     Plaintiff and Class Members allege that Defendants' unauthorized interception of electronic communications constitutes a clear and egregious violation of the Federal Wiretap Act, as described herein.

99.     Plaintiff and the Classes have been damaged by the interception or disclosure of their communications in violation of the Federal Wiretap Act, as described herein, and are thus entitled to preliminary, equitable, or declaratory relief; statutory and punitive damages; and reasonable attorneys' fees and litigation costs reasonably incurred. 18 U.S.C. §2520(b).

## COUNT III

### Unjust Enrichment

**(On Behalf of Plaintiff and Class Members Against All Defendants)**

100.     Plaintiff incorporates by reference paragraphs 1 through 77 of this Complaint as though fully stated herein.

101.     In South Carolina, to recover for unjust enrichment, a plaintiff must show: (1) a benefit conferred by plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value. *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 341 S.C. 1, 532 S.E.2d 868, 872 (2000).

102.    Plaintiff and the Class Members owned or leased vehicles equipped with telematics services provided by GM and OnStar, which collected extensive personal driving data, including, but not limited to, locations, speeds, and other driving behaviors, without the informed consent of Plaintiff and the Class Members.

103.    GM and OnStar, without the consent or knowledge of Plaintiff and Class Members, sold this highly personal and proprietary driving data to LexisNexis.

104.    LexisNexis, upon receiving the data from GM and OnStar, utilized it for various commercial purposes, including, but not limited to, the creation and dissemination of consumer reports. These reports were sold to third parties, such as insurance companies, generating substantial revenue for LexisNexis.

105.    GM, OnStar, and LexisNexis have unjustly enriched themselves by commercially exploiting Plaintiff' and Class Members' proprietary driving data, directly at the expense of their privacy and financial interests.

106.    Defendants' appropriation of Plaintiff' and Class Members' driving data constitutes the direct conferral of a benefit without just compensation.

107.    Plaintiff and the Class Members did not freely or knowingly allow Defendants to exploit their personal and proprietary data for commercial gain. If Plaintiff and the Class Members had been informed of Defendants' intentions to profit from their personal driving data, they would not have consented to such use.

108.    The enrichment of Defendants at the expense of Plaintiff and the Class Members is against equity and good conscience. Defendants' retention of the benefits without proper compensation to Plaintiff and the Class Members is unjust and warrants restitution.

109.   As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and the Class Members have suffered damages and have been deprived of the economic value of their personal and proprietary information.

110.   Plaintiff and Class Members have no adequate remedy at law.

## COUNT IV

### Invasion of Privacy

**(On Behalf of Plaintiff and Class Members Against All Defendants)**

111.   Plaintiff incorporates by reference paragraphs 1 through 77 of this Complaint as though fully stated herein.

112.   Plaintiff' and Class Members' personal and private driving data was collected, used, and disclosed by Defendants without their consent.

113.   Without the consent or knowledge of Plaintiff and Class Members, GM and OnStar collected comprehensive driving data, including, but not limited to, locations, speeds, and other sensitive information that Plaintiff and Class Members expected to remain private.

114.   GM and OnStar then disclosed this highly personal and sensitive information to LexisNexis, who further disseminated it to third parties, including insurance companies, for commercial gain.

115.   The publication of these private facts about Plaintiff and the Class Members by Defendants to third parties is offensive and not of any legitimate public concern.

116.   Defendants' actions, including the unsolicited sharing and publication of Plaintiff' and the Class Members' personal driving data, intrude upon the solitude, seclusion, and private affairs of Plaintiff and the Class Members in a manner that would be highly offensive to a reasonable person.

117.    South Carolina courts recognize the tort of invasion of privacy under common law.

118.    The conduct of Defendants as described herein constitutes an invasion of privacy under two distinct theories recognized under South Carolina law: the public disclosure of private facts and intrusion upon seclusion.

119.    Defendants have engaged in the public disclosure of private facts by sharing sensitive and private driving data of Plaintiff and Class Members with third parties without their consent. These disclosures are highly offensive and not of legitimate concern to the public.

120.    Defendants have intentionally intruded upon the solitude, seclusion, and private concerns of Plaintiff and Class Members through their unsanctioned collection, use, and dissemination of private driving data. This intrusion is highly offensive and constitutes an invasion of privacy under South Carolina law.

121.    As a result of Defendants' conduct, Plaintiff and the Class Members has suffered damages.

## COUNT V

### Violations of the South Carolina Unfair Trade Practices Act

### S.C. Code Ann. § 39-5-10, *et seq.*

**(On Behalf of Plaintiff and Class Members Against All Defendants)**

122.    Plaintiff incorporates by reference paragraphs 1 through 77 of this Complaint as though fully stated herein.

123.    Defendants have engaged in unfair and deceptive acts in the conduct of any trade or commerce in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*

124.    Without the informed consent of Plaintiff and Class Members, Defendants engaged in a deceptive scheme by collecting, sharing, selling, and publishing sensitive personal driving data, thereby infringing upon the privacy rights and consumer expectations of Plaintiff and Class Members.

125.    OnStar and GM collected detailed personal driving data from vehicles operated by Plaintiff and Class Members. This data was shared with LexisNexis, who then sold and published it without the consent or knowledge of Plaintiff and Class Members, violating their reasonable expectations of privacy and data security.

126.    The dissemination of this personal driving data by Defendants, devoid of any meaningful context, has led to a misleading representation of the driving behaviors of Plaintiff and Class Members. This misrepresentation has the potential to, and in some cases has, adversely affected their ability to obtain fair insurance premiums and other consumer benefits.

127.    Defendants' actions have directly and proximately harmed Plaintiff and Class Members, including but not limited to financial harm through increased insurance premiums and the diminution of their privacy and control over personal data.

128.    Defendants' actions as described above constitute unfair methods of competition, unconscionable acts or practices, and deceptive acts or practices in the conduct of any trade or commerce within the meaning of S.C. Code Ann. § 39-5-20(a), in direct violation of the South Carolina Unfair Trade Practices Act.

129.    Plaintiff and the Class Members fall under the definition of "person" as stated in S.C. Code Ann. § 39-5-10(a), and the actions of Defendants have occurred in the context of conducting "trade" and "commerce" as defined by S.C. Code Ann. § 39-5-10(b).

130.    As a result of Defendants' violations of the South Carolina Unfair Trade Practices Act, Plaintiff and Class Members have suffered actual damages and are entitled to legal relief, including, but not limited to, restitution, injunctive relief to prevent further violations of South Carolina law, attorneys' fees and litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Members of the proposed Classes, respectfully requests that the Court enter an Order:

A.    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiff as representatives of the Classes, and appointing their counsel as Class counsel;

B.    Declaring that Defendants' conduct, as set forth above, violates the state statutes cited herein;

C.    Ordering injunctive relief including, but not limited to, ordering Defendants to delete all driver data of Plaintiff and Class Members, and to implement procedures to require consent before recording or selling their data;

D.    Awarding damages, including nominal, statutory, and punitive damages where applicable, to Plaintiff and the Class Members in an amount to be determined at trial;

E.    Awarding Plaintiff and the Class Members their reasonable litigation expenses and attorneys' fees;

F.    Awarding Plaintiff and the Class Members pre- and post-judgment interest, to the extent allowable;

G.    Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class Members;

H.    An award of punitive damages pursuant to 15 U.S.C. §1681n(a)(2) and 18 U.S.C. §2520(b); and

I.    Awarding such other and further relief as the Court deems reasonable and just.

### **JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 30(b), Plaintiff demand a trial by jury for any and all issues in this action so triable as of right.

DATED: July 5, 2024

MOTLEY RICE LLC

By    /s/ *P. Graham Maiden*

P. Graham Maiden
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
gmaiden@motleyrice.com

*Attorney for Plaintiffs*